```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
 UNITED STATES OF AMERICA,                                   :
                                                             :       17-CR-157 (VEC)
               -against-                                     :
                                                             :        MEMORANDUM
 HENRY RODRIGUEZ,                                            :     ORDER AND OPINION
                                                             :
                              Defendant.                     :
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/08/2020

VALERIE CAPRONI, United States District Judge:

Defendant Henry Rodriguez moves for compassionate release based on preexisting medical conditions that elevate his risk of serious and potentially fatal complications should he contract COVID-19. Although the Government concedes that Mr. Rodriguez's medical condition may constitute an extraordinary reason for release, it nevertheless contends that the motion should be denied because the Bureau of Prisons ("BOP") has adequately responded to the pandemic and because the considerations that informed Mr. Rodriguez's sentence remain unchanged. The Court, however, finds that BOP's pandemic response, while robust, falls short in key respects and cannot eliminate the heightened risks inherent in a carceral setting. Moreover, Mr. Rodriguez has served the vast majority of his sentence and would be eligible for release within the next month to a halfway house or home detention had he been transferred to his designated facility before the pandemic paralyzed BOP's prisoner movements. Considering the factors set forth in 18 U.S.C. § 3553(a), the Court has determined that a modest modification of his sentence is in order. Accordingly, Defendant's motion for compassionate release is granted.

The Court may reduce Mr. Rodriguez's sentence if "extraordinary and compelling reasons warrant such a reduction," and the reduction is consistent with the factors set forth in 18

U.S.C. § 3553(a) and applicable policy statements from the United States Sentencing Commission.[1]  18 U.S.C. § 3582(c)(1)(A); *see United States v. Lisi*, No. 15-CR-457, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).  The applicable policy statement provides guidance for ascertaining the existence of "extraordinary and compelling reasons" and further requires the Court to consider whether Mr. Rodriguez would pose a danger to others if released.  *See* U.S.S.G. § 1B1.13(2) (cross-referencing bail factors set forth in 18 U.S.C. § 3142(g)) & appl. note 1.

The Government does not dispute the severity of Mr. Rodriguez's medical conditions, and the Court finds that they satisfy the "extraordinary and compelling reasons" threshold.  *See* Gov. Opp. at 5 ("The Government does not dispute that Rodriguez suffers from the medical conditions set forth in his motion or that they may constitute a basis for the Court to find that the 'extraordinary and compelling reasons' threshold has been met.").  Specifically, Mr. Rodriguez suffers from psoriatic arthritis, an autoimmune disorder for which he is prescribed an immunosuppressant that weakens his body's ability to fight infections.  *See* Def. Decl., Ex. D (Dkt. 40-5).  He has also been diagnosed with asthma since childhood and continues to use an albuterol inhaler.  *See* Def. Decl., Ex. C (Dkt. 40-4).  Both conditions—particularly the suppression of his immune system—elevate Mr. Rodriguez's risk for severe illness if he contracts COVID-19, a potentially fatal illness for which there is no known treatment or cure.[2]

---

[1]  Because the BOP has denied Mr. Rodriguez's request for release, which was submitted on his behalf by his fiancée, the pending motion satisfies the exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A).  *See* Def. Decl., Ex. G (Dkt. 40-8).

[2]  According to the Centers for Disease Control ("CDC"), "[p]eople with weakened immune systems are at higher risk of getting severely sick from SARS-CoV-2, the virus that causes COVID-19."  Ctrs. for Disease Control and Prevention, *People Who Are Immunocompromised* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html.  For such individuals, including those that take immunosuppressants, "the best way to prevent COVID-19 is to avoid being exposed to this virus."  *Id.*  The CDC has also determined that moderate to severe asthma is a risk factor for severe illness.  Ctrs. for Disease Control and Prevention, *People with Moderate to Severe Asthma* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html ("People with moderate to severe asthma may be at higher risk of getting

As other courts in this circuit have routinely found, such conditions satisfy the "extraordinary and compelling reasons" threshold for a sentence modification during the COVID-19 pandemic.[3]

The Government contends that, notwithstanding Mr. Rodriguez's serious health concerns, his risk of contracting COVID-19 has been sufficiently mitigated by BOP's comprehensive response to the virus. While the Court does not doubt that BOP has taken many notable steps to protect the health of prisoners in its custody, several aspects of the federal government's overall response to the pandemic have hampered BOP's ability adequately to protect inmates, particularly high-risk individuals like Mr. Rodriguez, from exposure. For instance, the Metropolitan Detention Complex ("MDC") in which Mr. Rodriguez is detained provides face masks to inmates—but, due to constraints on supply, an inmate receives only one disposable mask per week, even though masks are to be worn inside the facility "as a matter of course."[4]

---

very sick from COVID-19. COVID-19 can affect [the] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."). Courts may take judicial notice of basic facts about the pandemic that are not reasonably in dispute. *See Basank v. Decker*, No. 20-CV-2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020).

[3]     *See, e.g.*, *United States v. Handy*, No. 10-CR-128, 2020 WL 2487371, at *1 (D. Conn. May 14, 2020) (granting sentencing reduction in part because defendant "receives immunosuppressant steroid injections"); *United States v. Smith*, No. 12-CR-133, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (holding that defendant's age and asthma condition constitute extraordinary and compelling reasons for release); *United States v. Campagna*, No. 16-CR-78, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence.").

[4]     The parties point to dueling expert reports from Homer Venters (a medical doctor), Jeffrey Beard (a psychologist with prison administration experience), and Asma Tekbali (an epidemiologist) that had previously been submitted in pending litigation concerning conditions at MDC. Def. Br. (Dkt. 40) at 8 (citing Facility Evaluation: Report by Dr. Homer Venters, *Chunn, et al. v. Edge*, No. 20-CV-1590, Dkt. 72-1 (E.D.N.Y. April 30, 2020)); Gov. Opp., Exs. 1–2. It is not necessary on this motion to determine where the truth lies between the declarations. Even accepting that Venter's declaration has exaggerations and inaccuracies (which it may) and even assuming that the Government's experts are relaying ground truth (which they may not be), it cannot be seriously disputed that being a federal prisoner currently brings with it added risks of contracting COVID-19. *See United States v. Scparta*, No. 18-CR-578, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("[I]ndividuals in carceral settings are at particularly high risk for contracting the disease because of the inability [for] individuals to socially distance, shared communal spaces, and limited access to hygiene products."). BOP may well have mitigated those risks to the maximum extent possible given resource limitations and the realities of the physical setting, but that does not change the fact that significant risks remain. For some prisoners, the balance between public interests and the risk to the detainee weighs against release; as to others, the balance tilts in favor of release.

Gov. Opp. at 7; Gov. Opp., Ex. 1 ("Beard Report") at 3. Moreover, contrary to at least one expert's recommendation, inmates are not provided with N95 masks, which filter out small airborne particles, because the limited supply of such masks is reserved for medical staff. *See* Beard Report at 9. While the CDC has not recommended that inmates wear N95 masks and has opined that disposable masks may be reused, *id.*, the CDC's recommendations appear to be dictated by resource scarcity[5] (and the need to prioritize the needs of medical personnel) rather than being the result of a scientific determination that inmates—particularly those who are immunocompromised—would not significantly benefit from having more protective masks given the risks associated with living in a congregate setting.[6]

Similarly, while the BOP has implemented screening and testing procedures, such efforts are focused on identifying symptomatic individuals, *see* Gov. Opp. at 6, despite common knowledge that COVID-19 can be spread asymptomatically.[7] Relying on the CDC's guidance that most people will develop only mild symptoms and not require treatment, the Government

---

[5] Earlier during the pandemic, "the Centers for Disease Control and Prevention attempted to address the mask shortage by recommending the use of bandannas, if necessary." Carolyn Johnson et al., *Shortages of Face Masks, Swabs and Basic Supplies Pose a New Challenge to Coronavirus Testing*, Wash. Post (March 18, 2020), https://www.washingtonpost.com/climate-environment/2020/03/18/shortages-face-masks-cotton-swabs-basic-supplies-pose-new-challenge-coronavirus-testing/. Even now, there appears to be an on-going shortage of personal protective equipment ("PPE") due in large part to the federal government's failure to take charge of ensuring that adequate supplies of appropriate PPE are available throughout the country—a reality that has required inmates to deploy single-use surgical masks for seven days. If released, Defendant should be able to maintain adequate social distancing and avoid contracting the virus without using a mask (except when he is in an environment in which social distancing cannot be maintained—an unlikely prospect in the near term given the condition of home incarceration).

[6] *See* Tekbali Report at 3 (citing Ctrs. for Disease Control and Prevention, *Personal Protective Equipment: Questions and Answers* (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html ("Unlike NIOSH-approved N95s, facemasks are loose-fitting and provide only barrier protection against droplets, including large respiratory particles . . . . Most facemasks do not effectively filter small particles from the air and do not prevent leakage around the edge of the mask when the user inhales.")).

[7] The CDC estimates that 35% of COVID-19 cases are asymptomatic. Ctrs. for Disease Control and Prevention, *COVID-19 Pandemic Planning Scenarios* (May 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

argues that most inmates do not need to be tested, and that asymptomatic patients should be deprioritized for testing. *See* Gov. Opp., Ex. 2 ("Tekbali Report") at 2 ("There are virtually no clinical interventions for patients who present with mild symptoms. Asymptomatic patients are not prioritized for testing per CDC guidelines."). There is no question, however, that universal testing, apart from informing individual treatment decisions, would significantly aid efforts to detect and isolate infected individuals in order to reduce transmission in group settings.[8] Thus, the Court can infer from BOP's triage strategy that the facility's containment efforts are hamstrung by an ongoing shortage of testing capacity, a phenomenon that has informed the CDC"s guidance.[9]

Accordingly, while the Court accepts that BOP is following CDC guidance, that guidance is itself the product of many missteps by the federal government earlier in the process; missteps that have cumulatively resulted in added risk to inmates being held in federal prisons. Put differently, the Court credits that the BOP is doing the best it can (and that, as of today, there appear to have been relatively few infections and no COVID-19 deaths in MDC), but even its

---

[8] The Court notes that, notwithstanding the Government's and the CDC's crabbed view of testing, the White House appears to be testing employees *daily*, according to its primary occupant. *See* Michael Crowley, *White House Rattled by a Military Aide's Positive Coronavirus Test*, N.Y. Times (May 7, 2020), https://www.nytimes.com/2020/05/07/us/politics/coronavirus-white-house-military-aide.html ("President Trump said he and Vice President Mike Pence, as well as the White House staff, would now be tested on a daily basis.").

[9] The Court does not deny the obvious logic of limiting testing to those for whom a confirmed diagnosis will affect therapeutic decision-making when testing is in short supply. Of course, had the United States Government not badly mishandled producing adequate testing supplies, the BOP could have had adequate testing supplies to better ensure that there were no asymptomatic inmates and to significantly mitigate the risk that asymptomatic corrections officers were in contact with detainees. Notably, other countries that have tested extensively have been far more effective at containing the virus. *See, e.g.*, Soo Rin Kim et al., *Trust, Testing and Tracing: How South Korea Succeeded Where the US Stumbled in Coronavirus Response*, ABC News (May 1, 2020), https://abcnews.go.com/Health/trust-testing-tracing-south-korea-succeeded-us-stumbled/story?id=70433504; *see also* Noah Weiland, *Anyone Who Wants a Coronavirus Test Can Have One, Trump Says. Not Quite, Says His Administration*. N.Y. Times (Mar. 7, 2020), https://www.nytimes.com/2020/03/07/us/politics/trump-coronavirus-messaging.html.

best involves rationing masks and tests. BOP's containment efforts, therefore, do not negate Mr. Rodriguez's compelling circumstances.

Turning to the § 3553(a) factors, the Court finds that reducing Defendant's sentence to time-served is consistent with the goals of sentencing and does not second-guess or relitigate this Court's original judgment. *See United States v. Ebbers*, No. 02-CR-1144, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020) (explaining that compassionate release is "not an opportunity to second guess or to reconsider whether the original sentence was just"). First, Mr. Rodriguez is due to be released on January 9, 2021, Def. Decl., Ex. G (Dkt. 40-8), which means that, with good time credits, he has now served all but seven months of his 60-month sentence. Second, the balance of the § 3553(a) factors now tilts in favor of a slightly shorter sentence. As other courts have found, the "history and characteristics of the defendant" and the "need . . . to provide the defendant with needed . . . medical care," § 3553(a), are factors that can support a sentence reduction during pandemic conditions when the defendant is particularly susceptible to illness. *See, e.g.*, *United States v. Pena*, No. 15-CR-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020). Although the Court was aware of Mr. Rodriguez's medical conditions at the original sentencing, his arthritis and asthma did not pose an out-sized risk of death pre-COVID-19. Thus, while the other sentencing factors, namely seriousness of the offense and the need for specific deterrence, remain unchanged, the extenuating circumstances of COVID-19 and Mr. Rodriguez's health favor a modest reduction of his sentence.[10]

Finally, the Court must consider dangerousness, which was a significant concern to the Court when sentencing Mr. Rodriguez. The Court notes that Mr. Rodriguez does not appear to have incurred disciplinary infractions since he was sentenced, and has instead consistently taken

---

[10] The Court notes that, but for the pandemic, Mr. Rodriguez likely would have been released to a halfway house or home confinement at around this point of his sentence.

advantage of dozens of courses offered by BOP. *See* Def. Decl., Ex. B (Dkt. 40-3). Additionally, the Court is modifying the conditions of supervised release to mandate that the first six months of Mr. Rodriguez's supervised release be served in home confinement. The Court finds that the risk to Mr. Rodriguez's health posed by COVID-19 and the possibility of a revocation of supervised release adequately ensure his expected compliance with the condition and sufficiently mitigate any risk to the community that he might otherwise pose. Hearing Tr. (April 4, 2019) at 48.

## CONCLUSION

For the foregoing reasons, Defendant's motion for a sentencing reduction is GRANTED. Mr. Rodriguez's term of incarceration is reduced to time served. The following special conditions are hereby added to Defendant's term of supervised release:

1. The defendant shall serve the first six months of supervised release on home incarceration, to be enforced by GPS Monitoring at the residence approved by probation.

2. In light of the COVID19 pandemic, the defendant must remain at his approved residence except to seek any necessary medical treatment, in each instance with prior notice and approval by the Probation Department.

3. The defendant is to possess or have access to a telephone that will allow video conferencing by the Probation Department.

4. Mr. Rodriguez is ordered to report to the Probation Department at 500 Pearl Street, 6th floor, on **June 22, 2020 at 10:00 AM** (following 14 days of self-quarantine) to have the GPS tracker affixed to his ankle.

5. During the 14-day quarantine, Mr. Rodriguez is ordered to remain at his home. No one other than the current residents and Mr. Rodriguez are permitted in the apartment during the 14 day quarantine period.

All other aspects of the sentence, including all other conditions of supervision, remain unchanged and in effect. The Government and MDC are directed to release Mr. Rodriguez *immediately*.

The Clerk of Court is respectfully directed to terminate docket entry 40.

**SO ORDERED.**

**Dated: June 8, 2020**
      **New York, NY**

_____
**VALERIE CAPRONI**
**United States District Judge**
